UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:11-CR-00107-FL

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>EDWARD HUCKABEE, )<br>)<br>Defendant. )<br>_____ ) | **MEMORANDUM AND**<br>**RECOMMENDATION** |

This matter is before the Court on Defendant Edward Huckabee's Motion to Suppress [DE-23]. The government filed a Response [DE-26] in opposition to the motion. To further develop the record, the Court conducted an evidentiary hearing on December 9, 2011, at which the government and Defendant with counsel appeared. The motion has been referred to the undersigned for memorandum and recommendation and is now ripe for decision. For the reasons that follow, the undersigned recommends that the motion be denied.

## STATEMENT OF THE CASE

On August 24, 2011, a Federal Grand Jury returned a single count Indictment [DE-1] charging Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924. On October 28, 2011, Defendant filed the instant motion to suppress, contending that law enforcement officers lacked reasonable suspicion to stop and question him and that, accordingly, evidence seized as a result of that stop was obtained in violation of the Fourth Amendment and should be suppressed. The Government argues in response that the law

enforcement officers had the requisite reasonable suspicion to stop Defendant and that no constitutional violation occurred.

## STATEMENT OF THE FACTS

Detectives Ian Lovell, Linda Hunter, and Kenneth Becker (collectively, the "Detectives") were the sole witnesses at the evidentiary hearing, and the Court finds the following uncontested facts based on their testimony.

Lovell, Hunter and Becker are detectives in the Vice and Narcotics Division of the Wilmington Police Department (the "WPD"). Detective Lovell had been a vice and narcotics detective for three years; Hunter for two years; and Becker for five years. Prior to joining vice and narcotics, Detective Lovell had four years of experience with the WPD, including assignment to a street level drug and gun unit; Hunter had 13 years of experience in various patrol units; and Becker had seven years of experience, including assignment to a street drug interdiction unit.

On May 5, 2011, the Detectives were working day shift vice in an area known as "the BO" or "the Bottom." Detective Lovell was patrolling alone in an unmarked police car, and Detectives Hunter and Becker were patrolling together in a second unmarked car driven by Becker. The Detectives were familiar with the Bottom, which they characterized as an "open air drug market" known for drug activity and violence, including shootings. While the Bottom is approximately a mile from downtown Wilmington, a tourist destination, the Bottom is a low-income, residential area with only one or two small corner stores and is not frequented by tourists. Detectives Lovell, Hunter, and Becker each had made multiple arrests on the particular block in the Bottom where the events in question occurred, and their unmarked vehicles were recognized by locals in the area as police cars.

At approximately 4:00 p.m., while patrolling the Bottom for drug-related criminal activity, Detective Becker noticed what appeared to be a new Chevrolet Camaro with a bar code sticker on the front window, which was indicative of a rental vehicle. Detective Becker recalled seeing the same vehicle earlier in the day across town in another area known for drug activity. Detective Becker's case report did not note the earlier sighting of the Camaro, but he was certain that it was the same vehicle and recalled the events of that day vividly. Seeing the same rental car in two known drug areas raised Detective Becker's suspicions because, in his experience, rental cars are used by drug criminals to hide themselves, as running the tags on a rental car provides no information regarding the occupants of the vehicle. Detective Lovell also noted that rental cars are frequently used by drug traffickers in the Wilmington area in an attempt to avoid the seizure of a personal vehicle in the event of a drug-related arrest and that often a third party will rent a vehicle for the use of others.

Detective Becker radioed Detective Lovell, who was approximately one block away, regarding a suspicious vehicle and asked him to run the license plate number. Detective Lovell encountered the Camaro head on, briefly made eye contact with the occupants, and turned to observe the plate number after he passed the Camaro. He then ran the number and confirmed that it was, in fact, a rental car. Detective Lovell encountered the Camaro multiple times and indicated that it appeared to be travelling in circles. Detective Lovell observed the Camaro travel south on 14th Street toward two marked police cars that were in the area on an unrelated domestic matter. The Camaro turned left onto Norman, just ahead of where the two marked police cars were parked. The Camaro slowed, pulled to the side of the street, and a passenger exited the Camaro, which then continued down Norman at a high rate of speed. Detective Lovell radioed to Detectives Hunter and Becker that an approximately six foot tall, dark complected

3

African-American male had exited the Camaro and was walking toward 14th Street. Detective Lovell then attempted to engage the Camaro; however, due to the high rate of speed at which the Camaro was travelling, he fell several blocks behind. Detective Lovell ultimately broke off his pursuit of the Camaro upon hearing that Detective Becker was in pursuit of a suspect.

Contemporaneous with hearing Detective Lovell's admittedly vague description of the passenger, Detectives Becker and Hunter turned onto 14th Street and observed a person meeting that description, later determined to be the Defendant, walking from the direction Lovell had indicated. Detectives Hunter and Becker noticed no other people in the area except the two police officers further down 14th Street. At this point, Defendant was walking across 14th Street toward Detectives Hunter's and Becker's unmarked vehicle. Defendant made eye contact with Detective Becker, but Defendant's attention appeared to be drawn to the marked police units from which he was walking away. Defendant continued walking across 14th Street and onto the sidewalk in the direction of Detectives Becker and Hunter who were approximately one-half block away.

Detective Becker pulled to the side of the road and Detective Hunter stepped out of the unmarked police car and approached Defendant from the front. Detective Hunter was approximately five feet from Defendant and was dressed in plain clothes with badges visible both around her neck and on her belt and her weapon holstered but visible on her right side. Detective Hunter asked Defendant, in a conversational tone, if she could talk to him, and he responded by saying, "Who the [expletive omitted] are you? You don't know me." Detective Hunter identified herself as a police detective and asked again if she could talk to him. Defendant again responded, "You don't know me," then turned and ran. The encounter between Detective Hunter and Defendant lasted for approximately five seconds.

4

Detective Becker exited the vehicle as Detective Hunter began to question Defendant. He moved around the back of the vehicle and approached the two from behind Detective Hunter as Defendant started to run. Both Detectives Becker and Hunter initially gave chase, but Detective Becker directed Hunter to get the car while he continued after Defendant. Detective Becker followed Defendant through a yard and encountered Defendant on the ground, caught in a large hedge row. Detective Becker observed Defendant lying on his back and reaching into his waistband. Detective Becker, believing that Defendant might be armed, drew his weapon and ordered Defendant to stop moving or he would shoot. Defendant responded that Detective Becker would have to shoot him, freed himself from the hedge, and continued to run. Detective Becker observed a firearm on the ground where Defendant had fallen and remained at that location to secure the weapon. Defendant was shortly thereafter taken into custody on 13th Street by uniformed officers.

## **DISCUSSION**

Defendant contends that the Detectives' encounter with Defendant constituted a Fourth Amendment seizure, that the requisite reasonable suspicion to make a constitutional seizure was lacking, and that all evidence obtained as a result of the seizure must be suppressed. The government counters that Defendant was not seized until after the discovery of the firearm and that at the time Defendant was seized there was reasonable suspicion to stop him. The Court agrees with the government that Defendant was not seized until after the discovery of the firearm and that no constitutional violation occurred.

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. The Fourth Amendment does not prohibit some questioning of an individual by law enforcement in a public place without any

5

suspicion of criminal activity. *United States v. Wilson*, 953 F.2d 116, 121 (4th Cir. 1991) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 1552, 113 L. Ed. 2d 690 (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

*Bostick*, 501 U.S. at 434. "Whether a seizure occurred depends on the totality of the circumstances, and the test has an objective component to the extent that it is a reasonable person's interpretation of the police conduct that is determinative." *Wilson*, 953 F.2d at 121 (citing *United States v. Gordon*, 895 F.2d 932, 937 (4th Cir. 1990)). Furthermore, "[w]hether a seizure occurred at all is an intensely fact-bound matter[.]" *Id.* The relevant inquiry is whether "the hypothetical reasonable person would have felt free to ignore [the officer's] questions and go on his way[.]" *Id.* The Fourth Circuit has explained that "freedom to leave means fundamentally the freedom to break off contact, in which case officers must, in the absence of objective justification, leave the [person] alone." *Id.* at 122 (quoting *United States v. Flowers*, 912 F.2d 707, 712 (4th Cir.1990)).

### 1. No seizure occurred prior to discovery of the firearm.

Defendant argues that his "encounter with multiple police officers constituted a seizure under the Fourth Amendment that required reasonable suspicion because a reasonable person would not have felt free to leave." Def.'s Mot. at 4 [DE-23]. The record in this case does not support such a conclusion.

Defendant's first encounter with the Detectives occurred when Detective Becker pulled his unmarked police car to the side of the road along which Defendant was walking and Detective Hunter exited the car and approached Defendant to question him. The testimony of

6

Case 7:11-cr-00107-FL Document 33 Filed 12/22/11 Page 6 of 11

both Detectives Hunter and Becker was that Hunter asked Defendant in a conversational tone if she could speak with him. Defendant responded to Detective Hunter by asking, in an abrasive manner, who she was and stating that she did not know him. When Detective Hunter identified herself as a police detective, Defendant again stated that she did not know him, then turned and fled. After Detective Hunter initiated contact with Defendant, Detective Becker exited the vehicle and approached from behind Detective Hunter, but did not reach her until Defendant had taken flight.

Defendant's initial encounter with law enforcement lasted for approximately five seconds. Detectives Hunter and Becker created no impediment to Defendant's ability to refuse to answer questions and walk away. Detective Hunter simply asked Defendant if she could speak with him and then identified herself as a police detective. Although Detective Hunter's badge and weapon were visible, no weapons were drawn, the Detectives were in plain clothes, no physical force was used, and the questioning was conversational and not intimidating. *See United States v. Gray*, 883 F.2d 320, 322-23 (4th Cir. 1989) (factors frequently considered by courts in evaluating whether an officer displayed a show of authority are (1) the number of officers present, (2) whether the officers were in uniform or displayed their weapons, (3) whether the officers touched the defendant or made efforts to physically block or restrain his movement, (4) whether the officer's questioning was conversational or intimidating, (5) whether the officer informed the defendant he was suspected of criminal activity rather than treating the encounter as routine, and (6) whether the officer promptly returned any requested identification). There is no evidence to support that a reasonable person would not have felt free to break off the encounter with Detective Hunter, and, in fact, that is exactly what Defendant did – he turned and fled.

7

This case is not similar to *Wilson*, as Defendant contends. In *Wilson*, the Fourth Circuit concluded that an "officer's prolonged and persistent questioning after the suspect had conveyed an unequivocal unwillingness to engage in further conversation with the officer is the type of conduct that is proscribed by the Fourth Amendment." 953 F.2d at 123. Despite the *Wilson* defendant's repeated attempts to end his encounter with police, the officers continued to follow him and pepper him with questions. The Fourth Circuit found that the prolonged and persistent questioning by the officers was the "functional equivalent of physical restraint[.]" *Id.* In the present case, there was no prolonged and persistent questioning and Defendant broke off contact with Detective Hunter within seconds. The fact that Detective Hunter asked Defendant a second time if she could speak with him does not convert the encounter into a seizure. The Fourth Circuit in *Wilson* declined to adopt "a *per se* rule that subsequent efforts by the police to maintain contact with the suspect, after being rebuffed, would amount to a seizure" and explained that the focus must be on both "the 'coercive effect' of the police conduct in question and the condition that there be some submission to the police." *Id.* The encounter between Defendant and Detective Becker was innocuous in comparison to the police conduct in *Wilson* that was found to be the functional equivalent of physical restraint. Therefore, the Court finds that no seizure occurred upon Detective Hunter's initial contact with Defendant.

Next, the Court must consider whether Detective Becker's pursuit of Defendant after he took flight was an unconstitutional seizure. The government argues that no seizure occurred when Detective Becker pursued Defendant, because Defendant never submitted to the show of authority. The Court agrees. The Fourth Circuit has explained that a seizure requires submission by the suspect.

> [T]he conveyance by the police of the message that a suspect was not "free to leave" does not necessarily end the inquiry. This is only a " *necessary*, but not a

> *sufficient* condition for seizure . . . effected through a 'show of authority.'" To have a completed seizure, the suspect must also have submitted to the policeman's authority.

*Wilson*, 953 F.2d at 122 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)) (original emphasis). Here, Defendant never submitted to Detective Becker's orders to stop and continued his flight until he was physically detained by the two uniformed officers. Detective Becker came upon Defendant entangled in a hedge row, lying on his back, and reaching into his waistband. Detective Becker, believing that Defendant was reaching for a weapon, drew his weapon and ordered Defendant to stop or he would shoot. While there is no doubt that Defendant at that point was not free to leave, Defendant did not comply with Detective Becker's order. Defendant instead responded that Detective Becker would have to shoot him, then freed himself from the hedge and ran away. Defendant never submitted to Detective Becker's show of authority; thus, no seizure occurred. *United States v. Cureton*, 2010 WL 675002, 367 Fed. Appx. 434, 437 (4th Cir. 2010) (unpublished op.) ("A defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated.").

After Defendant fled the hedge row, Detective Becker discovered the weapon, a Smith and Wesson 9 mm, on the ground in the hedge where Defendant had fallen. Detective Becker's discovery of the weapon provided sufficient probable cause for Defendant's subsequent arrest. *Id.* at 437 (affirming district court's denial of suppression motion where district court concluded that officer's discovery of discarded weapon "was clearly sufficient probable cause for an arrest."). Therefore, no unconstitutional seizure occurred, and there is no basis for suppression of the evidence obtained as a result of the Detectives' encounter with Defendant.

**2. Defendant's unprovoked flight, coupled with other factors, provided reasonable suspicion for an investigatory stop.**

9

Additionally, even if Detective Becker's pursuit and attempt to stop Defendant constituted a seizure, Defendant's flight, coupled with other factors, provided reasonable suspicion for an investigatory stop. Defendant argues that after he declined to talk with Detective Hunter "he was free to walk, or even run away[.]" Def.'s Mot. at 5. However, the Fourth Circuit has distinguished between waking away and running away from an encounter with law enforcement. In *United States v. Haye*, 825 F.2d 32, 33 (4th Cir. 1987), the defendant, who was suspected of being a drug courier, was stopped outside of an airport by two police officers and immediately fled. One of the officers pursued the defendant and ordered him to "stop or I'll blow your [expletive omitted] brains out." *Id.* The defendant stopped and upon questioning admitted to carrying drugs. *Id.* The Fourth Circuit concluded that at the time of the officers' initial encounter they "did not have reasonable suspicion sufficient for an involuntary investigative detention" and that the defendant "could have declined to answer questions and walk away." *Id.* at 34 (citing *Florida v. Royer*, 460 U.S. 491, 497-98 (1983)). However, because the defendant chose "sudden panic and precipitous flight" as opposed to simply walking away, the court found that "all of the circumstances, including the flight, furnished reasonable suspicion for a brief, involuntary, investigative stop." *Id.*

In the present case, Detective Hunter admitted that, although she was suspicious, she knew of no wrongdoing at the time she initiated the encounter with Defendant and that she had no reason to detain him before he ran. However, as in *Haye*, Defendant's abrupt response to Detective Hunter's attempt to initiate "a consensual conversation," coupled with her suspicions regarding the Camaro in which she believed Defendant had been a passenger, and the high crime area in which they were present, established the reasonable suspicion necessary to justify "a

brief, involuntary, investigative stop." *Id.* The Supreme Court has also sanctioned the consideration of unprovoked flight in the reasonable suspicion analysis:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Therefore, based on Defendant's presence in a high crime area, the Detectives' suspicions regarding the Camaro in which they believed Defendant had been a passenger, and, most significantly, Defendant's unprovoked flight when approached and questioned by Detective Hunter, Detective Becker's pursuit and attempt to stop Defendant was supported by reasonable suspicion.

## CONCLUSION

The Court **RECOMMENDS** that Defendant's Motion to Suppress [DE-23] be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 22nd day of December, 2011.

DAVID W. DANIEL
United States Magistrate Judge